Next case, which is the United States versus Green. Next case, which is the United States versus Green. We'll just wait a couple of moments until the ruckus is gone. All right. Good morning, Ms. Brunson? Yes, Your Honor. Good morning. My name is Kimberly Brunson, and I represent the appellant, Mr. Warren Green, in this matter. With the court's permission, I would like to request three minutes for rebuttal. Of course. Go ahead. Thank you. Your Honor, as you know, we've raised three issues in this appeal, and I would like to start with the second issue, and that is the lack of reasonable suspicion to justify Trooper Volk's actions in investigating other crimes on the second consecutive day. Let me ask you about this. Is it part of your argument that we can disregard the events of April 3rd as unrelated? Yes. Yes, Your Honor. As you know, this involved three stops and three sequential days, April 3rd, 4th, and 5th. The stop on the 3rd involved two gentlemen who were going to Long Branch, New Jersey, ostensibly to breed a dog. Trooper Volk had no indication. There's been no evidence whatsoever connecting that stop to our client beyond Trooper Volk's assertion that this dog was somehow the same dog that was in the car on the second day of Mr. Green's stop. Right. And what sort of complicates matters for you is the district court makes a finding of fact that it's the same dog. Well, I believe the district court made the finding that it resembled the dog. Let's see. Well, it was on page 23, Your Honor. Right. I have fact finding five was Volk later recognized the dog during a separate stop of Green's vehicle, which I suppose isn't saying it's the same. The opinion says the presence of the dog in defendant's car that Trooper Volk believed was the same dog he had observed in the car of two individuals two days earlier who were on pretrial release for drug-related violations. I mean, yes, obviously Trooper Volk at one point believed or asserted that he believed this was the same dog. He also backed away from that during cross-examination and in his affidavit of probable cause, which was written on April 5th, the same day that the warrant was issued. In the warrant, he said the dog resembled one that was in a car two days earlier. In addition to that, for putting all of this... He did, Your Honor. He seemed to be actually, if I may say so, confused about the dog. He certainly gave wrong information to his friends on the day of April 5th when he called Trooper Brottingham. He said this was the same dog. I pulled over two guys yesterday going to New Jersey. In fact, it was two days ago and they were going... Excuse me, yesterday going to Philadelphia. In fact, it was two days ago and they were going to Long Branch, New Jersey. Trooper Wolk seemed to be filling in the blanks where it fit so that... And I would posit, Your Honor, if I saw someone yesterday walking outside of my hotel with a short-haired dog that looked like a pit bull and I saw someone when I left the courtroom today walking a short-haired dog that looked like a pit bull, it wouldn't be reasonable for me to conclude that's the same dog that the people had two days ago. You know, there are many dogs that travel and there's never been in this case any evidence linking the dogs beyond Trooper Wolk's speculation that this was the same dog. Okay. So if there's no finding that they're the same dog, your argument is there's nothing else about the April 3rd stop that's relevant at all? Correct. Okay. So if we put aside April 3rd and we focus on April 4th and April 5th, right, obviously the question of the moment is, is there enough on those two days for reasonable suspicion? That is correct. It seems like Trooper Wolk is sort of patching things together and a reasonable argument could be made that there's enough. Why isn't there? Trooper Wolk believed on April 4th, the first stop of our client, that both he and another person were, and I'm using Trooper Wolk's words, super special. He thoroughly searched both of their vehicles and found no contraband. Now I understand during that time he claimed to have learned certain things, you know, no luggage, the fact that our client was going to Philadelphia to visit family. And on the next day, Trooper Wolk asserted that coming back one day later is inconsistent with our client's description of his travels, which is I'm going to visit family for how long, I don't know. Trooper Wolk never followed up on that. There's nothing inconsistent. There's nothing contradictory about coming back 24 hours later from a trip that takes five hours one way. Why wasn't it inconsistent? I would say anything that our client did would have been inconsistent in Trooper Wolk's mind. If he had come back three days later, that would have been inconsistent because he had no luggage. If he had come back a week later, that would have been inconsistent. There's no inconsistency because our client never said how long he was planning on staying. We're trying to ascertain whether or not Trooper Wolk at some point had reasonable suspicion to prolong the stop. I guess my question is simple. If you compare what he said on April 4th with what occurred on April 5th, it's a simple question. Why wouldn't his return be inconsistent with what he said on April 4th? Because what he said on April 4th was, I'm not sure how long I'm staying. I'm going to visit family. It depends. How long he's staying, it depends. I'm not sure. Rather than being inconsistent, would you think that a return the very next day would at least be surprising? Not necessarily, Your Honor. Again, it's only a five-hour trip one way. I know of people who have traveled to Philadelphia and returned the same day. And it's the same route. Your five hours is five hours from Pittsburgh? Five hours from Pittsburgh. Where he was exactly stopped. I believe it's from Pittsburgh, Your Honor. It's five, five and a half. So you would not think it would even be surprising? No, not necessarily. If he had initially told to revoke, I'm staying a week. Let me ask the question this way, then. The return in 24 hours, you don't think anything about that could constitute reasonable suspicion? Not under the circumstances of this case, Your Honor, given what our... Is there any evidence in the record that he was wearing the same clothes? There's nothing that indicates that. Okay. One way or the other. Right. Because I don't think we see him in the first part of April. He's visible, I believe, on the rear camera. But I'm not sure the entire body, perhaps just from the waist down. Okay. But, you know, overall, again, the dog, I believe, is a red herring. Mr. Green's story about his travel was not inconsistent. It wasn't contradictory. You know, his nervous behavior, if one watches the videos, there's really no difference. Mr. Green is clearly a talkative person. He offers a lot of details when not asked. There's no difference between his demeanor on April 4th and April 5th, I would say, when you compare the videos. But yet Trooper Volk puts emphasis on he says that on April 4th he was fine, but on April 5th he was too nervous. Again, Trooper Volk admitted from the moment he saw the car, before he even knew that Mr. Green was driving it, before he knew that there was a dog in the car, he was going to follow that car, find a reason to pull him over. And that's exactly what he did. This was a pretextual stop. And I understand the pretext is irrelevant when the stop is justified by probable cause that a traffic violation has occurred. But I would posit that the pretext is not irrelevant when it comes to defining the scope, whether or not the scope and duration of the stop is reasonable. First of all, he pulled the car over on the 4th because he was riding in tandem. He was riding in tandem, he pulled over on the 4th. He had a window tint violation. He pulled him over, he has a window tint, he has a given ticket for window tinting. He searches the car, he goes on his way. Subsequently, he then finds out that Mr. Green had a number prior to the arrests. Arrests, yes. Alright, so that's where he is. State of mind. Volk's state of mind. Within 24 hours, somebody who at least in their description of where they were going and how long they were staying, without obligation, is returning on the turnpike. Sees him again, coming west of him. Alright. Yeah, whether pretextual or not, he stops him. He stops him for speeding, going 79, 70 miles an hour. Okay. Now, is there something there? This person who he pulled over the first day, who he finds out had a drug arrest, is coming back within 24 hours. And now he stops him for speeding. Well, Your Honor. Stops him for speeding, but he knows what I just articulated. And now he sees this dog that's either the same or resembles a dog who was with people who he had some suspicions about two days ago. Again, though, yes. But that's simply not a reasonable suspicion. I know factors in isolation aren't, you know, you don't have to look at them individually. But combined, they have to eliminate a substantial portion of innocent travelers. And the fact that criminal records Is it your best argument that the dog does not infer drug dealing? Of course. Why don't I say that? Fair enough, Your Honor. I mean, that's what I was trying to articulate. You know, two black guys have a dog on April 3rd, and another black guy has a dog on April 5th. And, oh, my God, they must be drug dealers because they're on the fancy brakes. Well, you said it much more directly than I have. I mean, the fact of the matter is there are many, many people who travel with dogs. And many dogs look alike. And there's Correct. Right. Assuming that you find there's probable cause for stopping the person. Yes. Right. Which he clearly did immediately. You know, this stuff had nothing to do with speeding, I would posit. I mean, Mr. Trooper Volk immediately engaged in actions that were designed to investigate drug crimes. But, yes, so we have a man who's driving to Philadelphia who had a criminal record or criminal arrest in the past and says he's going to visit family. I'm not sure how long I'm staying there. It's only a five-hour drive. The next day he's coming back. I mean, that would authorize the stops of any person who has had a criminal history of any sort when they make a short trip or perhaps even a long trip. Again, there's just no inconsistencies. There's nothing that suggests that Mr. Green was lying. Well, after the dog alerted. Okay, the dog alerted. So they had to have reasonable suspicion. So they had a reasonable probable cause of the dog alerting. What role, if any, because Judge Gibson didn't make it part of his decision, what role, if any, was the trunk and the fact that the trunk the day before smelled of marijuana? What role, if any, does that play in our review? I would say it plays no role, or if anything, it shows a lack of reasonable suspicion. When Trooper Volk searched his car the day before with consent and found these things and smelled marijuana, allegedly, but found no marijuana on the day he smelled it, I don't see how that could add to the reasonable suspicion analysis the next day when he didn't smell marijuana. Why isn't there? I thought he smelled raw. Raw is what the test was. He found the raw marijuana. Tell us the difference in your understanding between marijuana, which I would agree with my colleague would have a pungent odor that even we would recognize. I don't want to speak for him, actually. I'll say I could recognize. And raw marijuana, which I understand, tell me if I'm wrong, at times, depending on its composition, has no odor. I can't speak to that, Your Honor, because I actually don't know the difference. I would just assume that it's different from burnt marijuana. I think there's a distinctive smell when someone is smoking marijuana, had Trooper Volk smelled it. Let's go back to my point, though, with the addition of raw versus processed. We're here looking at the question. We're reviewing the district court's decision for clear air on factual questions and on a primary basis on the question of law. And the question of law that we have in front of us is not necessarily what the district court found, but the question is whether or not there's reasonable suspicion. So you're saying that the pungent smell of raw marijuana the day before doesn't add any factor to what is before us? No, I do not believe it does, because Trooper Volk had every intention of searching this vehicle on day two with no more information other than he was returning. He knew the car smelled of marijuana the day before. At what point, then, does that reasonable suspicion end? Would he be allowed to call another officer down the road in Harrisburg and say, I think I missed something, I smelled raw marijuana? Well, if you cite Peters, and I think Peters' case would be what you're calling it. Correct. 24 hours later after a quoted trip to Philadelphia or wherever he went, a turnaround, does that add anything? Because we're looking at this in a plenary fashion. We might disagree with what Judge Gibson found, but the question before us is reasonable suspicion. Correct. I'm just trying to ask a thing. Can we consider the smell of raw marijuana? It can be considered, but I think it has to be considered in context, which is there was no allegation of marijuana smell on April 4th. It was April 5th, I believe, is when the record shows that Trooper Volk was saying yesterday it smelled like raw marijuana. There was no finding of any raw marijuana. The car was searched thoroughly. It's simply not enough to add up to the level of intrusion. Yes, you can argue that it still doesn't get it across to reasonable suspicion. You are arguing that the stop was improperly extended for Rodriguez, correct? Correct. I think the lesson from Rodriguez is that every intrusion must be justified by the requisite reasonable suspicion or probable cause that led to the seizure in the first instance. In this case, the stop was based on alleged speeding. Even though it was a pretextual stop, once we get to that point, all the trooper knew when he pulled over Mr. Green and spoke to him for a few seconds was that he was coming back because his daughter had allegedly broken her leg and he had a dog in the back seat. That doesn't add up to reasonable suspicion to believe that other criminal conduct is at hand. In fact, Trooper Volk took no steps, really, toward the speeding violation. He admitted he immediately got back in his cruiser, called Trooper Brodingham, started speaking about how he just caught that dude by accident, you know, and he's got the dog. He admits on cross-examination, I think the appellate is around 190. It's on cross-examination where 193 to 198, he admits he called Trooper Brodingham, he was waiting for backup, and he also says, I'm sure I was getting a hold of the canine, perhaps. So he was getting a hold of the dog immediately after pulling over Mr. Green. Even the issuing of a warning ticket, I think, could be decided to be related to the investigation. In what world are you pulled over twice by police officers, the same police officer two days in a row and given warning tickets? There was really no action taken toward resolving the alleged speeding. This was all about the drug investigation from the very beginning, which Trooper Volk essentially admits. So the warning ticket on April 5th was pretextual to just extend the chatting? I believe the circumstances of this case, yes, support that conclusion, Your Honor. I see I'm very much out of time. Are there further questions or should I come back for rebuttal? I have a question, Counselor. Of what value to the trooper is that on the 4th he smelled marijuana, he was given permission to search and he found nothing? Yes. The next day it's the same car that the day before had smelled the marijuana but was empty. So he asked permission to search and is denied. Is there any implication that Trooper Volk can draw from that as to a reasonable suspicion that some other crime has been committed by Mr. Green? Insofar as Mr. — And that there is now something in that trunk that Mr. Green does not want to be discovered? No, Your Honor. First of all, I don't believe that a refusal to consent to a search can ever be considered as part of the reasonable suspicion analysis. And furthermore, it's very — Is there a case that says that? I believe there is, but I would follow up in a letter, Your Honor. I'm not sure. Leal, United States v. Leal, I believe does at least allude to that. But I could follow up if Your Honor would like, certainly. It would be great if you would follow up. Absolutely. When would you like that? Why don't you get us something in a week and we'll give the government — well, just give me a second. What's today? Today's the 23rd? Yes, Your Honor. So you get us something by the 30th and the government, if you can get us something by the 3rd of November? Is there some limitation on how long you would like it to be? How long would you like? It depends on what I find, Your Honor. Why don't we say five pages in each will be the maximum? Thank you. You have to use it up. Thank you, Your Honor. But beyond that, again, looking to what Mr. Greene said to Trooper Volk, he said, you know, I want to get back. My daughter broke her leg. I'm in a hurry. I don't believe that, you know, there should just be no conclusion, because one day he allows a consensual search and the next day he doesn't, that he somehow is hiding something. I mean, that really would allow the ‑‑ it would be extended very quickly to the refusal to consent in the first instance would trigger some sort of suspicion on the part of the officer. And citizens should be free to refuse consent because the intrusion, there's no de minimis exception to the Fourth Amendment, and every intrusion on a person's liberty must be both in scope and duration limited to the justification for that seizure in the first instance. That is the lesson, I believe, of Rodriguez and what was violated in this case. Is there anything else you want to say? Yeah, he said he has no other questions. Okay, thank you. Thank you. May it please the Court. My name is Michael Ivory. I'm an Assistant U.S. Attorney and I'm from Pittsburgh. Good morning, Your Honors. Good morning. I think with respect to the April 3rd traffic stop, that that has to factor into what occurred on April 5th because reasonable suspicion is evaluated under the officer's cumulative knowledge. But you've got to help me with this, right? Yes, sir. Two black guys unrelated with a dog. Two days later, another black gentleman with a dog. You've got to help me. Well, we have to look at it from Trooper Volk's perspective based upon the lens of his training and his experience. He doesn't see black men with dogs? No. I'm not saying that, Your Honor. It's that he is a 20-year veteran of the Pennsylvania State Police. He's engaged in hundreds of traffic stops. He's taught interdiction. That's all set forth in the affidavit of probable cause contained in the appendix in this case. He is confronted with the situation on April 3rd where he pulls two guys over who have a dog. They're allegedly taking this dog to New Jersey to have it bred. He runs their names. There are other indicators of criminal activity involved there. The renter of the vehicle is not there. It's a rental vehicle. He runs their names. His computer freezes. He sends them on their way. The stop lasts four minutes. They offer to sell him a dog. He looks at the dog. He sees the dog. Remember, this is a Pennsylvania State. This is a trooper with 20 years' experience. I mean, they are trained to observe things. After they leave, the two gentlemen leave, the computer unfreezes, and he learns that those two individuals are involved in drug trafficking activity. I believe both individuals were involved in, the record is what the record is, but my recollection of the record is that both of them were involved in drug trafficking activities, and one specifically was of interest to the City of Pittsburgh Narcotics Unit. Yeah, but that's not it. Yes, it is. Is it? Yes, it is. During an exhibit D of the traffic stop, the April 5th traffic stop, he mentions, I believe, to his lieutenant, when he's calling after he says it's the same dog, that he learned one of those individuals was actually of interest to the City of Pittsburgh, City Narcotics. Well, first of all, during Volk's testimony, he says that he believed he had only the license for one of the gentlemen, and did not ask for the license from the other, so that would be quite a feat to figure out someone whose identity he doesn't know has a criminal record, and that the one gentleman he did get the information on was on pretrial release. If you have different information, please tell me. Yes, Your Honor, I certainly shall. What I have is a reference to page 4 on page 147. It says that he learned the men were on pretrial release for federal drug violations, and then he learned... This is his testimony? I'm so sorry. This is his testimony, and I believe one of the findings of fact made by Judge Gibson. And he also learned that one of the occupants was of interest to the City Narcotics Unit, and that is found approximately 19 minutes and 27 seconds into exhibit D. That's the videotape of the April 5th traffic stop. Let's go back. Let's get to the dog. Let's get to the dog here. We've got these April 3rd gentleman with a dog, and then we've got Mr. Green with a dog on April 3rd. Correct. And we know who Mr. Green is. We understand where Green... where he was on the 4th, where he was on the 5th. You've got this dog. The same dog that affidavit said resembled the dog from April 3rd, his testimony said it was the same dog, but then he said maybe he's not sure it looked like the same dog. Okay. Does this dog really mean anything? I think... It's pretty tough. It's pretty tough to identify... tough enough to identify an individual with... really tough to identify. I have to disagree respectfully. Go ahead. When Troop Revolt sees the dog, it's almost kind of like a eureka moment. He's able to figure out at least his theory, or at least what he thinks is going on, is that these guys on the 3rd were taking money out to buy drugs, and they had the dog along for protection, and that Mr. Green is bringing the drugs back, and the dog is also along for protection. Yes, he does. He says that at several points. During the conversation he has with Trooper Brodingham, as well as with his lieutenant at the barracks when he calls in to obtain information about the April 3rd stop through the track system. Right. So he says at various points throughout that conversation, those conversations on that tape, that it's the same dog, it's the same dog. He tells that to Trooper Brodingham. He tells his own supervisor, I almost collapsed when I saw that it was the same dog. Now, you know, is it the same? He does say that. That's what he calls Brodingham on the 5th. Right. He says he can't believe it's the same dog. And he says the same thing to his lieutenant. But then shortly after, it no longer resembles. Well, that's true. That's true, but... And on the 3rd, there's a finding by Judge Gibson that he only saw him for two seconds on the 3rd. Well, again, it's a day apart. I mean... Two days apart. Two days apart. He does make the same mistake and said it was a day apart. Well, apparently, Trooper Volk did testify that he was involved in several other traffic stops. In fact, whenever the April... There's a black gentleman with dogs. We do not know that, Your Honor, but I can tell you that on April 5th, he was completing a traffic stop when Mr. Greens and Pallet drove past. He was actually... Let's look at this case just for a second. Let's take the dog out. Okay. Take the dog out. Because of the inconsistencies. Where are you under Rodriguez on the question of reasonable suspicion to extend the stop without the dog? You certainly have grounds to extend the stop to engage in further investigative activity aside and apart. You have to look at everything that occurred on April 4th. You have Mr. Green, who's traveling to Philadelphia for an indeterminate period of time. He has no luggage. He has a record involving guns and drugs. He has... The characteristics of the... Okay, he has a record. Yeah, that's correct. He had an arrest. The record... Our record shows it was an arrest, right? No. Actually, Trooper Volk testifies and states, again, he's been arrested so many times for guns and drugs, it's hilarious. He says that in Exhibit D... Exhibit C, I'm sorry, to Trooper Seifert whenever they're discussing what's going on. Trooper Seifert was the backup trooper who came to assist during the two... the in tandem track that occurred on April 4th. But then you also have the weird characteristics of the trunk of Mr. Green's car. There's no keyhole, apparently. It can only be accessed through either a special latch or by folding down the rear seat. And once you fold down the rear seat, Trooper Volk testified that he smelled raw marijuana. And the following day, he informs another trooper that that meant to him that it had been used to transport marijuana in the past. Is there any reference in the record to what raw marijuana smells like? Because I'm a bit confused because... Is it like burnt marijuana? No. Because here's the question. If you said yes, it was burnt marijuana, then I think that would reasonably add to the calculus of reasonable suspicion. If it's not in the record, it's not in the record. But if it is in the record, I'd like to know what it smells like. I did not see any references to the difference between raw marijuana and burnt marijuana. But if I can find something, maybe I can include it in my response. I didn't see anything in the record that specifically would differentiate between the two. Now, I do know the difference because I was a drug prosecutor for a number of years. But again, what I know would be the oars of the record, and I can't get into that right now. But I don't think that there is anything... Is raw marijuana the plant? Raw marijuana is the... It's bulk marijuana. It's usually compressed into a cube of some type. It's sticky. It has a sweet, cloying smell to it. It sometimes leaves a residue. Sometimes it doesn't, depending if it's packaged properly or not. Burnt marijuana smells like oregano. Yeah. And nobody smokes oregano. I might take the fifth on that one. No. Oh, jeez. I'm sorry about that. I don't know about smoking oregano, Your Honor, but that's what it does smell like. Go ahead. You were on a reasonable suspicion of that at all. So, you know, we have him going to Philadelphia for an indefinite period of time, lack of luggage, odd characteristics concerning the car, the smell of marijuana, a drug history, and then less than, you know, the first traffic stop occurs roughly at 10 a.m. on April the 4th. The second one occurs about 10 a.m., maybe 25 hours later, which meant that Mr. Green would have to have left for Philadelphia very early in the morning. And if he's visiting family, you know, actually you can consider the fact that there is a dog present. Maybe it's not the same dog, but at least it's suspicious enough. What are you doing with this dog? I thought you were going to visit family. You're in Philadelphia for like less than 18 or 20 hours, and you're coming back to Pittsburgh, and you're speeding. Oh, the other thing as well, April 4th, Mr. Green is not nervous at all during his interactions with the police. April 5th, according to Troop Revoke, he is shaking like a leaf. Everything is on camera on the 5th, unlike the 4th. That's true. And on the 5th, he looks like he's pretty relaxed. In the back, he's looking at them, you know. Troop Revoke says, you know, he's not looking at me. He's averting his eyes. He's nervous. I'm looking at the tape. He seems to be looking right at them. It's a bright, sunny day. You can see what's going on. When we were talking about the initial portion of the traffic stop, that's whenever Mr. Green is still seated in the car. Troop Revoke goes over to the side of the car, begins to announce the purpose for the stop. He recognizes Mr. Green, and he says, you again. Then a couple of seconds later. Which is a ruse. We'll find out on the transcript. But Mr. Troop Revoke did testify that he had no idea that Green was driving the vehicle until he actually approached the car and recognized Mr. Green. So then that's when he comes back, and he tells Trooper Brottingham, this guy is shaking like a leaf. We can't see that because it's not. That's not depicted. Now there is another portion when Mr. Green comes out, as Troop Revoke is explaining the traffic citation, giving him the warning. And again, you know, Volk is a trained investigator. He is able to detect nervousness, how people are reacting. I mean, he was talking about how being overly friendly is an indicator of criminal activity, that being tight with people, trying to conceal your nervousness. And he said that Mr. Green exhibited all of those characteristics during the April 5th stop when he just happened to have heroin in the trunk of his car and did not exhibit those characteristics on the April 4th stop when he had nothing, nothing in his car other than the AR-15 soft pellet gun. But I think under the totality of those circumstances, reasonable suspicion to extend the scope of the stop did exist. But again, with the dog, the presence of the dog was suspicious in that it did resemble the dog that was involved in the April 3rd traffic stop. And again, we have to look at the cumulative. So the addition to the reasonable suspicion calculus is Volk's statement that he thought the dog was for protection? That's correct. And that kind of would make sense given the characteristics of Mr. Green's, because the only way you could apparently access it was to get into the car itself. You had to fold down the seat, and if you have a pit bull in the car itself, that makes ripping off the drugs very... I don't think anybody's described it as... I am not a dog person. I'm admittedly not a dog person. Apparently Volk is not either. But I don't remember a reference to a pit bull to give us the illusion that this was a protection at all. I saw a reference to an American bully, which doesn't mean anything to me. You do see the dog being removed from the car when the troopers are trying to execute the search warrant, and it is, in my estimation, an aggressive-looking animal. It certainly would scare me from going into a car. Let me ask you a Rodriguez question. Yes, Your Honor. Under Rodriguez, when in this series of events on April 5th, would you say the stop was extensive? If we're looking at a definitive point, I believe it would be after Trooper Volk realizes that Mr. Green's driving the car, he sees the dog, he realizes that it's inconsistent with Mr. Green's account for being in Philadelphia, traveling to Philadelphia for an indefinite period of time to visit family. So I think by the time he calls Trooper Broding, and he has, for want of a better term, a eureka moment, that at that point justification to extend the stop exists. So that's just before the closing back and forth when he shakes his head. That's the point in time? Because he asks him to consent, he says no, and he says wait. Right. And I thought that Broding, how do you pronounce it? Broding. Broding. Broding. Right, he comes up to him after that. There's the phone call to Trooper Broding, there's the five minutes afterwards during which he prepares the citation, then there's when he interacts with him to give him the citation, yes. At that point? No, I believe it's earlier than that, but he's still completing the traffic stop itself. Okay, so if that's true, then that means the exchange that we see on camera with Trooper Volk is not part of what you believe is the justification for reasonable suspicion? I just want to know at the point in time, because if we take that out, then you're taking out our ability to see him with the trooper. You have to look at this thing as kind of like an emerging, ongoing, Well, that's why we asked you a question. You said earlier. But when, well, it's a continuum. It is a continuum, but, I mean, certainly the grounds are laid whenever he sees the dog and he realizes that there's something bigger going on here than just a mere traffic stop, and he does enunciate those suspicions that Trooper Broding. Now, at that point, I believe he is permitted to extend the scope of the stop, the mission of the stop, too, and gather additional evidence, and I believe he does testify to that. At one point he was talking about testifying in that regard. I just want to know the point in time that we can stop and say, okay, now let's consider whether there's reasonable suspicion a la Rodriguez. Right. I believe it's up to the point when the citation is issued, and anything up to that point I believe can factor into reasonable suspicion at that point. Did he issue the citation after he called Broding? Yes, he did. So you said before he called Broding. I misspoke. Okay, I'm just trying to ask you. I want to start calling this the Rodriguez moment. As we analyze these cases. Justice Alito warned us about this question. And I know that the courts have, the other circuit courts of appeals, have been grappling with that very same issue. So I thank you for your time, Your Honors. Thank you very much. Okay, thanks so much. Do you have anything further, Judge Nygaard? No, I have no questions. Thank you, Judge. Thank you, Your Honor. We'll have rebuttal, please. Thank you, Your Honor. I would posit that reasonable suspicion was required as soon as he returned to his cruiser because he measurably extended the stop by calling Trooper Broding. Possibly he said he was. So you would say the Rodriguez moment was when he returned to the cruiser. Absolutely, absolutely. Rodriguez has made it very clear there's no de minimis exception. The moment the officer starts engaging in activities that are designed to investigate other crimes, other than that which justified the seizure in the first instance, in this case, the beating, reasonable suspicion is required. So at that point in time, that's the Rodriguez magic moment in my mind. Supreme Court might say, whoa, wait a minute. There was much more time elapsed in Rodriguez, and we never expected something this narrow in time to be the Rodriguez moment. I'm not so sure. I think Justice Ginsburg, at least, would agree with me. She was very clear in writing for the majority in Rodriguez and the dissent in Combias that, you know, the length, the duration of time is not what matters necessarily. It's the length of time. Anything that measurably extends, you can measure it. If it's just a little bit of time, that's enough, as well as the scope. You know, it must be, the officer's actions must be judged by not only the length of time, but what they do. So how does that help you, though, in your argument, moving it up to the timing effect that we get? All he knew at that point was that Mr. Green was returning home after 24 hours of visiting relatives. Again, there's all this talk. Still without luggage, not with the dog. Pardon me? Still without luggage, not with the dog. Still driving the car and the smell of raw marijuana that couldn't be accessed. Yeah, if I could speak to that briefly. There's been no evidence, there's no evidence as to how long raw marijuana would leave a residue smell. There's no evidence as to how long Mr. Green owned this car. Perhaps the smell of raw marijuana sticks around for months or longer. I don't know. But there's been no evidence that says smell of raw marijuana would mean that there had recently been raw marijuana. You might conclude that, but there's no evidence to support that conclusion. Well, yeah, but the fact, there's nothing in the record that says what raw marijuana smells like, right? Correct. So the only thing we have is what we can, I hesitate to use the term judicial notice, but I mean we're putting ourselves in the shoes just for the moment of true provoke to see what he knew, and then we can judge it. Someone says they smelled raw marijuana. That's part of the calculus. You're right. We don't know how long it's been there or when it was last there or whatever, but it is part of the calculus. It is part of the calculus, but it also goes to the weight of that factor. Had there been testimony that said raw marijuana only leaves a smell generally for a week or a day, it would, I think, be more relevant to the calculus and carry more weight in the reasonable suspicion analysis. Likewise, this whole special latch thing, you know, I mean my Honda doesn't have a hole in the back. You have to use the remote, and if the remote's broken, the only way to get into it is going through the back seat. So there's, you know, yes, the only way to get into this trunk was to go through the back seat, but there's no indication it was in any way altered from its original state. It may have simply been a broken remote that won't allow you to get in there any other way. So the argument you're making then is that all of those observations about the trunk can't add to reasonable suspicion because it didn't, in its testimony, say these are indicia of drug trafficking that I've seen and therefore rely on. I think there could have been more evidence to support that, which is lacking in this case. And, you know, Trooper Volk is certainly an experienced officer, but he was also wrong the day before when he thought that both Mr. Green and the other individual were super special. Putting aside Mr. Green, there was nothing in the other person's car. There's no indication that there was, you know, he was correct in that analysis. I mean, he's human, and it just seems under the totality of the circumstances here, every single thing was designed to add up to reasonable suspicion, such that Trooper Green or Trooper Volk could once again search his car on April 5th. And if I can speak very quickly, I believe that Appendix 147, Trooper Volk says that the one person in the car on April 3rd was on pretrial release. And, of course, there's no evidence as to whether or not that person was allowed to travel. People on pretrial release can be permitted to travel with permission from the court of their probation officer. So that, I think, adds nothing to this case. Again, the totality of the circumstances in this case do not show reasonable suspicion sufficient to justify a second search of Mr. Green on April 5th. All right. Thank you very much. Thank you. And I will follow up with the letter to this court. Great. Counsel, thank you for a well-argued case. We'll take the matter under advisement.